**In re MF GLOBAL HOLDINGS LIMITED INVESTMENT LITIGATION.**

**Joseph Deangelis, et al., Plaintiffs,**

**v.**

**Jon S. Corzine, et al., Defendants.**

**This document relates to the Commodities Customer Class Actions.**

**No. 11 Civ. 7866(VM).**

United States District Court, S.D. New York.

Signed Feb. 11, 2014.

Brian C. Kerr, Brower Piven, A Professional Corporation, David A.P. Brower, Brower Piven, Jeffrey Craig Block, Whitney Erin Street, Block & Leviton LLP, New York, NY, Jason Mathew Leviton, Scott A. Mays, pro hac vice, Berman DeValerio, Boston, MA, Amanda Marjorie Steiner, Girard Gibbs LLP, Christina H. C. Sharp, Daniel Charles Girard, pro hac vice, Girard Gibbs LLP, San Francisco, CA, Christopher J. Lovrien, Michael S. McCauley, Peter E. Davids, pro hac vice, Jones Day, Los Angeles, CA, Jeff I. Ross, pro hac vice, John B. Orenstein, Ross & Orenstein LLC, Minneapolis, MN, for Plaintiffs.

City of Philadelphia Board of Pensions and Retirement and Palisade Strategic Master Fund (Cayman) Limited, pro se.

Andrew J. Levander, Matthew Lester Mazur, Rebecca Sarah Kahan, Dechert, LLP, Jonathan R. Streeter, U.S. Attorney's Office, Schuyler G. Carroll, Shan A. Haider, Perkins Coie LLP, David Michael Rosenfield, Lisamarie Frances Collins, Therese Marie Doherty, Herrick, Feinstein LLP, Christopher Michael Joralemon, Mark Adam Kirsch, Goutam Umesh Jois, Ladan Fazlollahi Stewart, Lisa Heather Rubin, Gibson, Dunn & Crutcher, LLP, Arthur Harlod Aufses, III, Craig Louis Siegel, Paul Henry Schoeman, Kramer Levin Naftalis & Frankel, LLP, Ethan Yu Lee, Justin Anthony Alfano, Sean Miles Murphy, Milbank, Tweed, Hadley & McCloy LLP, Stuart Jay Baskin, Adam Selim Hakki, H. Miriam Farber, Shearman & Sterling LLP, Dean Lindsay Chapman, Estela Diaz, Joseph Lee Sorkin, Robert Henry Hotz, Jr., Akin Gump Strauss Hauer & Feld, Edmund Polubinski, III, David Brendan Toscano, Davis Polk & Wardwell L.L.P., David A. Barrett, Marilyn C. Kunstler, Boies, Schiller & Flexner, LLP, Neil Stephen Binder, Binder & Schwartz LLP, Julia Nestor, Davis Polk & Wardwell L.L.P., G. Robert Gage, Jr., Gage, Spencer & Fleming, LLP, Daniel E. Reynolds, Frank H. Wohl, Michael Dayton Longyear, Lankler Siffert & Wohl LLP, Brett Gerald Canna, Jayne S. Robinson, Kathryn Ann McDonald, Robinson McDonald & Canna LLP, Gregory John O'Connell, Philip Canning Patterson, Vera Marie Kachnowski, De Feis O'Connell & Rose, P.C., John F Savarese, John F. Lynch, Ralph M. Levene, Steven Peter Winter, Wachtell, Lipton, Rosen & Katz, Cohen Milstein Sellers & Toll P.L.L.C., New York, NY, James N. Benedict, Thomas A. Arena, Milbank, Tweed, Hadley & McCloy LLP, Los Angeles, CA, Laura Steinberg, Sullivan & Worcester LLP, Boston, MA, David A. Geier, Geier Homar & Roy, LLP, Madison, WI, Darren Bernens Kinkead, Christopher James Barber, Steptoe & Johnson LLP, Chicago, IL, Daniel A. Nathan, Morrison & Foerster L.L.P., Washington, DC, James J. Capra, Jr., James P. Cusick, David M. Fine, King & Spalding LLP, New York, NY, for Defendants.

### *DECISION AND ORDER*

VICTOR MARRERO, District Judge.

## TABLE OF CONTENTS

I. INTRODUCTION ........................................................166

II. BACKGROUND ........................................................168
 A. THE PARTIES.......................................................168
 1. Plaintiffs and the Trustee ......................................168
 2. D & O Defendants ..............................................169
 3. Defendant PwC ................................................169
 B. LEGAL BACKGROUND .............................................169
 C. FACTUAL ALLEGATIONS .........................................170
 1. Allegations Against the D & O Defendants ..........................171
 2. Allegations Against PwC .......................................174
 D. PROCEDURAL HISTORY .........................................174

III. LEGAL STANDARD ..................................................174

IV. DISCUSSION ........................................................175
 A. CLAIMS AGAINST D & O DEFENDANTS ............................175
 1. CEA Claims ..................................................175
 a. Direct Violations .........................................175
 b. Aiding and Abetting ......................................177
 2. Common Law Claims ............................................179
 a. Choice of Law ...........................................179
 b. Breach of Fiduciary Duty .................................180
 c. Aiding and Abetting Breach of Fiduciary Duty.................182
 d. Conversion and Aiding and Abetting Conversion .................183
 e. Negligence ..............................................184
 f. Tortious Interference with Contract and Business Advantage.....186
 g. Aiding and Abetting Breach of Bailment .......................187
 B. CLAIMS AGAINST PwC ............................................187
 1. Customers' Professional Negligence Claim .........................187
 2. Trustee's Professional Negligence and Fiduciary Duty Claims ..........189
 C. LEAVE TO REPLEAD .............................................191
 D. CONCLUSION ...................................................191

V. ORDER ..............................................................191

APPENDIX ..............................................................192

\* \* \*

Several former commodities customers of MF Global, Inc. (collectively, "Plaintiffs" or the "Customers"), individually and on behalf of all others similarly situated (the "Class" or the "Customer Class"), and as assignees of James W. Giddens, the trustee appointed in the liquidation of MF Global, Inc. (the "Trustee"), filed a Consolidated Amended Class Action Complaint for Violations of the Commodity Exchange Act and Common Law (the "CAC") (Dkt. No. 382) against defendants Jon S. Corzine ("Corzine"), Henri J. Steenkamp ("Steenkamp"), Bradley I. Abelow ("Abelow"), Laurie R. Ferber ("Ferber"), Edith O'Brien ("O'Brien"), Christine A. Serwinski ("Serwinski"), David Dunne ("Dunne"), Vinay Mahajan ("Mahajan"),[1] and PricewaterhouseCoopers LLP ("PwC"; collec-

---

1. Defendants Corzine, Steenkamp, Abelow, Ferber, O'Brien, Serwinski, Dunne, and Mahajan are collectively referred to as the "D & O Defendants."

tively, "Defendants").[2] The CAC alleges direct violations of the Commodity Exchange Act of 1936, as amended (the "CEA"), and the regulations promulgated thereunder (the "CFTC Regulations"), in violation of Section 22 of the CEA, 7 U.S.C. § 25 ("Section 22"); aiding and abetting violations of the CEA and the CFTC Regulations, in violation of Section 13 of the CEA, 7 U.S.C. § 13c ("Section 13"), and Section 22 of the CEA; and various claims under the common law. Defendants moved to dismiss all counts of the CAC under Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)") (*see* Dkt. Nos. 422, 426), and the parties have fully briefed the motions.[3]

## I. *INTRODUCTION*

This case is one of many in the vast litigation that arose out of the catastrophic collapse of MF Global Holdings Limited ("MF Global"). The Court has previously compared this matter to a "massive train wreck" that caused injuries to thousands of unknowing and unsuspecting victims. *See In re MF Global Holdings Ltd. Sec. Litig.* (*MF Global I* ), 982 F.Supp.2d 277, 287–89, No. 11 Civ. 7866, 2013 WL 5996426, at *1 (S.D.N.Y. Nov. 12, 2013). MF Global's demise naturally spawned lawsuits from the many people who suffered harm from those events. But it was the Court's hope, as expressed at the initial conference on this matter, that the parties could avoid burdening each other, the judicial system, and the public with costly and time-consuming motion practice.

Unfortunately, the Court's aspiration was not to be realized. In view of the significance of the issues, the magnitude of the stakes, and the multitude of vital interests involved, the Court's earlier message bears repeating. If the Court's central point was not hearkened, perhaps it was not heard by these parties on either occasion. Instead of coming together to resolve this matter in a just and efficient way, the parties continue to file lengthy motions and oppositions—as the list itemized in the appendix attests, almost two dozen submissions—failing to concede any ground to each other even in the light of clear, controlling case law that should generate agreement and consensus among people moved by reason, good faith, and common sense. While this wasteful and rancorous litigation unfolds, investment customers harmed by these unfortunate events must wait for any compensation due them, without knowing how much they will recover or when they will receive any assets they wrongfully lost because of the violations of law claimed in this litigation. Surely, the parties' conduct here does not exemplify the goal of the Federal Rules of Civil Procedure: "to secure the *just, speedy,* and *inexpensive* determination of every action and proceeding." Fed. R.Civ.P. 1 (emphasis added).

The Court previously denied motions to dismiss complaints filed by purchasers of MF Global securities, *see MF Global I,* 982 F.Supp.2d 277, No. 11 Civ. 7866, 2013 WL

---

**2.** The CAC also named the Chicago Mercantile Exchange, Inc. and the CME Group Inc. (collectively, the "CME Defendants") as defendants. By letter dated November 7, 2013, Plaintiffs informed the Court that they had agreed in principle to a settlement with the CME Defendants. (Dkt. No. 563.) The Court thus suspended briefing on the CME Defendants' motion to dismiss the CAC. (Dkt. No. 566.)

**3.** The Court has reviewed the parties' filings in this matter. In all, the parties filed 23 separate memoranda of law in connection with Defendants' motions to dismiss. Those memoranda are listed in the Appendix to this opinion, and within this opinion the memoranda are referred to by the abbreviated names listed in the appendix.

5996426, and by the United States Commodity Futures Trading Commission ("CFTC"), *see Deangelis v. Corzine*, No. 11 Civ. 7866, 2014 WL 216474 (S.D.N.Y. Jan. 17, 2014). In so doing, the Court has repeatedly emphasized that, at this stage of the litigation, the standard is lenient and a plaintiff's burden is not onerous. The Court must accept Plaintiffs' factual allegations to be true and draw reasonable inferences and resolve doubts about the cause of MF Global's collapse in Plaintiffs' favor. To survive a motion to dismiss, Plaintiffs need only show that, assuming the truth of the facts they plead, it is plausible that Defendants are liable for the alleged misconduct. In a spectacular financial collapse of the magnitude that Plaintiffs exhaustively detail in their amended complaint, an account that draws from and is supported by reports issued by legislative and regulatory bodies on the public record, it is reasonable to infer that someone, somewhere, at some time did something wrong to set in motion such an extraordinary chain of events causing such extensive harm to so many people and interests.

Plaintiffs' CAC meets that minimal threshold in many respects. The CAC is a comprehensive, 198–page, 576–paragraph account of MF Global's collapse. Specifically, Plaintiffs focus on how MF Global, Inc. ("MFGI"), a wholly-owned subsidiary of MF Global, illegally transferred funds belonging to its customers in order to finance MF Global's other proprietary operations. The customer funds at issue were, under the CEA and the CFTC Regulations, untouchable. MF Global and MFGI were not permitted to use them as liquidi-

ty; to the contrary, the law required the MF Global companies to keep those customer funds segregated and secured. But when MF Global faced a liquidity crisis, it steadily reached into the excess amounts stored in those customer accounts. Eventually, as MF Global was on the brink of collapse, MFGI ignored the regulations that prohibited use of segregated funds and transferred those funds to MF Global. The end result was that approximately $1.6 billion of assets that were supposed to be off-limits went missing. Customers who had been assured that their deposits were secured instead learned that those deposits had vanished.

■ Plaintiffs' account of the events is compelling. Their allegations are not merely based on general pleadings asserted on information and belief; instead, they are culled from public records that detail MF Global's demise. The CAC is strewn with references to reports and hearings conducted by congressional and executive committees and by the trustees for MF Global and MFGI.[4] Yet MF Global's high-ranking officers, including several of the Defendants here, continue to assert, as they did in opposing claims asserted by MF Global securities investors as well as by the CFTC, that it is not even *plausible* that any one of them could bear *any* responsibility for any part of the harm MF Global's disintegration caused. The D & O Defendants fill page after page with argument in their efforts to disclaim and avoid liability.[5]

But in large part, Defendants' efforts are fruitless; the D & O Defendants cannot overcome the inconvenient reality that

---

**4.** In evaluating a motion to dismiss, the Court may consider any documents cited and relied upon or incorporated by reference in the complaint as the factual sources of the pleadings. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir.2002).

**5.** In total, the D & O Defendants' memoranda of law and reply memoranda span 177 pages, not counting the accompanying voluminous declarations and exhibits.

the facts contained in the CAC, if true, give rise to two reasonable inferences: that a massive collapse such as that which MF Global experienced does not occur in a vacuum, nor in a corporate environment characterized by diligent management and vigilant oversight by officers and directors; and that in this case senior MF Global and MFGI officers failed in property exercising their legal responsibilities to MFGI's customers. Here, the CAC describes in ample detail what happened at MF Global during the summer and fall of 2011–not only that $1.6 billion of Plaintiffs' customer funds went missing from accounts at MF Global that were required to be segregated and secured, but that the money vanished because MF Global's entire senior management leadership, corporate accountability, and required oversight all went missing as well. Through unsound business judgments that set MF Global on the course to its eventual crash, and their failure to provide the company proper management guidance and control at the peak of the crisis, these officers and directors became the agents of the debacle at MF Global. To the grim portrait of those events that Plaintiffs depict, Defendants' response, stripped down to its essence, suggests that there is nothing wrong with this picture. The Court has previously summarized its response to these arguments: "In evaluating the application of the law that Defendants argue would allow the outcome they seek at this stage of the litigation, the Court's assessment may be simply stated: It cannot be." *MF Global*

*I,* 982 F.Supp.2d at 291, 2013 WL 5996426, at *4.

Of course, in litigation, efficiency is a two-way street. At the initial conference, the Court urged the many plaintiffs in this litigation to avoid filing claims without a sound basis in law and fact. Yet Plaintiffs here brought claims that fly in the face of clear precedent from the Second Circuit and the New York Court of Appeals, and they have brought other claims against some defendants who could not plausibly bear responsibility for any of the harm Plaintiffs allege. Plaintiffs also fill substantial pages of their own trying to brace some of those claims,[6] but excessive pleading quantity cannot negate lack of quality. No amount of argument can overcome the lack of legal support for several of the claims Plaintiffs filed in this action.

Thus, for the reasons detailed below, Defendants' motions to dismiss are granted in part and denied in part.

## II. BACKGROUND [7]

### A. THE PARTIES

#### 1. Plaintiffs and the Trustee

Plaintiffs in this case are "commodities customers of MFGI who deposited cash or other assets at MFGI that MF Global and the D & O Defendants were required to segregate and/or secure" under the regulatory scheme described below. (CAC ¶ 37.) They bring their claims on behalf of themselves and on behalf of all other persons and entities similarly situated. They also bring claims on behalf of the Trustee, ap-

---

6. Plaintiffs' three separate opposition memoranda total 136 pages, not counting declarations and other attachments.

7. Except where otherwise noted explicitly, the factual summary below is derived from the CAC and the documents cited or relied upon for the facts pled therein, which the Court accepts as true for the purposes of ruling on a

motion to dismiss. *See Spool v. World Child Int'l Adoption Agency,* 520 F.3d 178, 180 (2d Cir.2008) (*citing GICC Capital Corp. v. Technology Fin. Grp., Inc.,* 67 F.3d 463, 465 (2d Cir.1995)); *see also Chambers,* 282 F.3d at 152. Except where specifically quoted, no further citation will be made to the CAC or the documents referred to in it.

pointed pursuant to the Securities Investor Protection Act ("SIPA") as successor-in-interest to MFGI, which claims the Trustee assigned to Plaintiffs. (CAC ¶ 38.)

### 2. D & O Defendants

The D & O Defendants were each "a board member, officer and/or member of senior management of MFGI or MFG Holdings, with responsibility and control over the day-to-day oversight and management of one or both companies." (CAC ¶ 23.) More specifically, Corzine was President of MFGI and Chief Executive Officer and Chairman of MF Global; Steenkamp was Chief Financial Officer of MF Global; Abelow was President and Chief Operating Officer of MF Global and a member of MFGI's Board of Directors; Ferber was General Counsel to both MF Global and MFGI and a member of MFGI's Board of Directors; O'Brien was Assistant Treasurer of MFGI; Serwinski was Chief Financial Officer of MFGI; Dunne was Global Treasurer of MF Global (until August 2011) and head of Treasury for MFGI's capital markets division; and Mahajan was Global Treasurer of MG Global (from August 2011 onward).

### 3. Defendant PwC

PwC was "the independent auditor of MFGI and MF Global during the period from 2010–2011." (CAC ¶ 90.) According to the CAC, as part of its audit, PwC "should have performed tests to understand and evaluate internal controls over financial reporting as a basis for designing its audit procedures, including steps to understand and test the practices and procedures followed by MFGI with respect to control activities for safeguarding Customer Funds" as required by the CEA and the CFTC Regulations. (CAC f 90.)

### B. LEGAL BACKGROUND

Plaintiffs' allegations of violations of law in this case are grounded on the provisions of the CEA and the CFTC Regulations. A brief description of that regulatory framework is appropriate to guide the factual discussion.

MFGI operated in part as a futures commission merchant ("FCM"). An FCM is an agent of its customers; it takes money that customers deposit with it and uses those funds to facilitate trades in futures contracts through commodities exchanges. FCMs are subject to the CEA and the regulations promulgated thereunder by the CFTC.

A central part of the CEA's regulatory scheme is the segregation of certain customer funds. Section 4d of the CEA, 7 U.S.C. § 6d ("Section 4d"), requires an FCM to treat the assets that a customer deposits as "belonging to such customer." 7 U.S.C. § 6d(a)(2). The CEA provides that customer assets "shall be separately accounted for and shall not be commingled with the funds of such commission merchant or be used to margin or guarantee the trades or contracts, or to secure or extend the credit, of any customer or person other than the one for whom the same are held." Id.; see also 17 C.F.R. § 1.22(a). Each FCM also must calculate, at the end of each business day, the amount that it is required to maintain in segregated accounts and the amount that it actually has maintained in segregated accounts. 17 C.F.R. § 1.32(a). The FCM must report those amounts to the appropriate regulators. Id. § 1.32(d).

The CEA and the CFTC Regulations also permit an FCM to deposit its own assets in the same bank account as customer assets and then to use its share (but not the customer's share) of the account for normal business purposes. 7 U.S.C. § 6d(a)(2); 17 C.F.R. § 1.25(e). But the

CFTC Regulations caution that the FCM's deposits into those bank accounts should be made for the purpose of ensuring that the FCM has sufficient funds for customers. *See* 17 C.F.R. § 1.23(a)(1) (noting that FCM can deposit its assets with customer assets "as [the FCM] may deem necessary to ensure any and all futures customers' accounts from becoming under-segregated at any time.").

While Section 4d and its associated regulations control the segregation and protection of funds for customers trading in domestic markets, different rules control funds for customers trading in foreign markets. Those regulations require that an FCM maintain an account with sufficient funds "to cover or satisfy all of its obligations to" customers trading in foreign markets "denominated as the foreign futures or foreign options secured amount." 17 C.F.R. § 30.7(a). A separate regulation specifies a formula that determines the "foreign futures or foreign options secured amount." *Id.* § 1.3(rr). The upshot is that, while funds deposited by domestic-trading customers must be segregated on a dollar-for-dollar basis, funds held for foreign-trading customers must be secured according to a formula that accounts for the customers' open positions.

The CFTC Regulations also require each FCM to engage an outside auditor to review the FCM's financial statements. *See id.* § 1.16. The audit "must include a review and appropriate tests of the accounting system, the internal accounting control, and the procedures for safeguarding customer and firm assets in accordance with the provisions of the [CEA] and the regulations thereunder[.]" *Id.* § 1.16(d)(1). More specifically, the regulations require the auditor's review process to "be sufficient to provide reasonable assurance that any material inadequacies existing at the date of the examination in . . .

the procedures for safeguarding customer and firm assets . . . will be discovered." *Id.* If the auditor discovers material inadequacies in the FCM's internal controls, it must inform the FCM, which in turn must inform the appropriate regulators. *Id.* § 1.16(e)(2). If the FCM fails to inform the regulators, or fails to do so with proper specificity, then the auditor must inform the regulators. *Id.*

## C. *FACTUAL ALLEGATIONS*

The Court assumes familiarity with the facts Plaintiffs allege, which are similar to those described in *MF Global I*, 982 F.Supp.2d at 292–301, 2013 WL 5996426, at *4–13. As laid out in that opinion, MF Global, under Corzine's leadership, made proprietary investments in European sovereign debt through repurchase-to-maturity ("RTM") transactions (the "RTM Strategy"). Allegedly due to a lack of internal controls, the RTM Strategy unraveled in October 2011 and led to the disappearance of $1.6 billion in customer funds. The additional facts described below relate to Plaintiffs' claim that Defendants are liable for Plaintiffs' losses attributable to those missing funds.

As noted in *MF Global I*, the RTM Strategy put substantial strain on MF Global to meet capital and liquidity requirements. *See id.* at 299–300, 2013 WL 5996426, at *12. MF Global thus used intra-day, intra-company transfers to cover those demands. Frequently, the transfers involved moving funds from the FCM to MF Global's other operations.

According to Plaintiffs' allegations, O'Brien was principally in charge of approving these intra-day, intra-company transfers. Mahajan and Dunne, who at various times served as the MF Global's Global Treasurer, had company-wide oversight over MF Global's funds. Serwinski was the head of MF Global's Financial

Regulatory Group and monitored MFGI's segregated and secured accounts. The Financial Regulatory Group prepared daily statements, in accordance with the CFTC Regulations, to ensure compliance with the regulatory framework that governed customer assets.

The CAC states that the intra-company transfers were "tracked, if at all, by recording manually on spreadsheets and journal entries," and that such tracking was applied inconsistently. (CAC ¶ 130.) Plaintiffs thus allege that MF Global and MFGI had no reliable method to trace the intra-company transfers or to ensure that sufficient funds remained in segregated and secured customer accounts. Moreover, according to Plaintiffs, the D & O Defendants received several internal reports that detailed the inadequacy of MF Global's internal controls. Despite these reports, according to the CAC, the D & O Defendants and PwC, as auditor, did not take appropriate steps to ensure that customer funds would be protected as required by the CEA and the CFTC Regulations.

### 1. Allegations Against the D & O Defendants

Plaintiffs allege that movement of assets from MFGI accounts that included customer assets began in July of 2011. During that month, Steenkamp asked Serwinski to evaluate how MFGI might use the "Firm Invested in Excess" and "Regulatory Excess" in those accounts to cover MFGI's liquidity needs. "Firm Invested in Excess" was MFGI's term for the assets MFGI had in customer accounts that exceeded the amount required to be segregated. "Regulatory Excess" was the term used to describe the assets in customer accounts that exceeded the minimum regulatory requirements. Because funds belonging to customers trading on foreign markets did not need to be secured on a dollar-for-dollar basis, the Regulatory Excess amount was greater than the Firm Invested in Excess amount.

The CAC states that even before Serwinski responded to Steenkamp's request, on at least one occasion O'Brien transferred $100 million out of customer accounts to fund MF Global's other operations. Serwinski expressed concern about the transfer. Later, in her response to Steenkamp's request, Serwinski told Steenkamp and Dunne that transfers from Firm Invested in Excess and Regulatory Excess were legal, but that heavy reliance on these amounts ran the risk of dipping into segregated or secured customer funds. Steenkamp acknowledged the risk and also explained the regulatory structure to Corzine. According to Plaintiffs, "by no later than early August, Defendants Serwinski, Steenkamp and Corzine were at all times aware of and acknowledged the limits on uses of customer segregated property." (CAC ¶ 202.)

Throughout the following months, MFGI regularly transferred funds from customer accounts to fund MF Global's proprietary operations. And in spite of Serwinski's cautionary warnings about using too much of the Firm Invested in Excess amounts, on at least one occasion—October 11—a transfer from customer accounts to another account caused Firm Invested in Excess to drop below *negative* $20 million. MFGI also took advantage of the greater flexibility in how the CFTC Regulations treat foreign-traded secured accounts. Because the foreign-traded accounts did not have to be segregated on a dollar-for-dollar basis, MFGI transferred funds from those accounts to cover the more stringently regulated domestic-traded segregated accounts. Thus, according to Plaintiffs, "by late July 2011, the MF Global enterprise was relying heavily on the putatively segregated

Customer Funds in the Customer Accounts to cover short-term liquidity shortfalls caused by the Company's new principal trading activities." (CAC ¶ 208.) O'Brien aptly described this entire process of shuffling money among different MF Global and MFGI accounts as a "shell game." (CAC ¶ 221.)

Mahajan joined MF Global in August 2011, replacing Dunne as the company's global treasurer. According to the CAC, Mahajan recognized that his department's internal controls were inadequate. But given the growing liquidity crisis, Mahajan decided instead to focus on maximizing liquidity instead of fixing problems with internal procedures. In sum, Plaintiffs allege, the D & O Defendants "ignor[ed] obvious deficiencies in MF Global's liquidity and capital management infrastructure" (CAC ¶ 221) and "were willfully blind [to] or disregarded MF Global's liquidity crises" (CAC ¶ 222).

The liquidity issues continued to worsen into late-summer 2011. As MF Global continued to rely on customer accounts to fund other business operations, Corzine requested daily updates concerning the excess assets in those customer accounts. The increased reliance on customer account excess worried Steenkamp, who expressed concern to Corzine, Abelow, Mahajan, and others that the excess was not a reliable source of funds and should not be relied on to permanently fund MF Global's operations. Plaintiffs claim that "the liquidity source available from funds held in Customer Accounts had become so vital to the continued survival of MF Global that management never acted to ensure that such customer funds were safe and segregated for the benefit of customers." (CAC ¶ 240.)

By mid-October 2011, the Firm Invested in Excess amount was negative on a regular basis. The D & O Defendants and other MF Global personnel looked to other parts of the company to secure sufficient funds to meet regulatory requirements. But the D & O Defendants also prioritized the health of MF Global's other operations. For example, when O'Brien requested permission from Mahajan to transfer funds from MF Global's proprietary operations to the FCM (to repay funds that the FCM had previously lent to MF Global), Mahajan resisted.

Eventually, as described in *MF Global I*, see 982 F.Supp.2d at 299–301, 2013 WL 5996426, at *12–13, Moody's downgraded MF Global's debt after the it took a $119.4 million valuation allowance against deferred tax assets. Thereafter, regulators, including the CFTC, contacted MF Global to express concern about its precarious financial position. Several of the regulators stressed that MFGI should not transfer funds from customer accounts in violation of the CEA and the CFTC Regulations governing secured and segregated assets.

On October 25, 2011, O'Brien sent a document to Steenkamp, Abelow, Corzine, Mahajan, and others, which showed that the FCM had only $60 million in available liquidity. However, on October 26, O'Brien authorized the transfer of $615 million from the FCM to MF Global's other operations. Only Serwinski contacted O'Brien to question the transfer. O'Brien later requested that MF Global return funds to the FCM, but the funds were not returned. At the end of the day, Firm Invested in Excess was below negative $340 million. O'Brien informed the other officers that the FCM's liquidity was then at zero dollars.

Even with the negative Firm Invested in Excess, MF Global represented to regulators that it was in compliance with appropriate regulations for safeguarding customer funds. However, it was later

determined that a $415 million transfer from the FCM on October 26 was not properly accounted. According to Plaintiffs, when that transfer is included, "MFGI had a deficiency of Customer Segregated funds in the amount of $298,835,867." (CAC ¶ 290.)

On October 27, O'Brien transferred another $200 million from the FCM to MF Global. Serwinski, despite being on vacation, again requested an explanation for the transfer. O'Brien failed to explain why the transfer was made and also noted that MF Global had failed to return the funds to the FCM.

During the day on October 28, MFGI detected a $300 million shortfall in customer segregated accounts. But MFGI personnel, including O'Brien, attributed the shortfall to the erroneous exclusion of a $540 million transfer to MFGI. They thus determined that MFGI was not under-segregated and did not report the shortfall to regulators. It was later determined that there was no missing transfer of funds, and that MFGI was in fact under-segregated on October 28.

On October 29, Corzine learned that one of MF Global's accounts at J.P. Morgan Chase & Co. ("J.P. Morgan") was overdrawn. Thereafter, Corzine and Mahajan directed O'Brien to transfer funds to cover the overdraft. O'Brien dipped into segregated customer accounts to effectuate the transfer. When J.P. Morgan requested assurances that the transfer complied with regulatory requirements, O'Brien refused to provide those assurances.

As MF Global collapsed, the D & O Defendants tried to sell the company and its assets. MF Global eventually found a buyer. However, as part of completing the sale, MFGI employees discovered a deficit of over $900 million in customer segregated accounts. While at first the deficit was believed to be a bookkeeping error, it was later determined that the deficit was accurate. As a result, the prospective buyer pulled out of the transaction.

In addition to the funds missing from customer segregated accounts, the Trustee later determined that approximately $700 million in funds that should have been secured for customers trading on foreign exchanges was taken from MF Global's United Kingdom subsidiary, MFGUK, in its liquidation proceeding. Plaintiffs allege that these funds were lost in part because of MFGUK's decision to swap funds held in secured accounts at MFGUK with T-Bills held at MFGI (the "T–Bill Swap Program"). The T–Bill Swap Program would allow MFGI to use the customer funds as a source of liquidity. In 2007 and again in 2009, outside counsel recommended against implementing the T–Bill Swap Program because the program might not protect customer funds. Nonetheless, in a decision that involved Steenkamp, Dunne, and O'Brien, among others, MFGI and MFGUK implemented the T–Bill Swap Program.

Under the T–Bill Swap Program, MFGUK was supposed to segregate and secure the T–Bills, rather than treating them as MFGUK property. MFGUK repeatedly certified to MFGI and to regulators that it was following this requirement. However, when MF Global collapsed, it was discovered that MFGUK had used the T–Bills for proprietary purposes. According to Plaintiffs, the T–Bill Swap Program "was a contributing factor to the shortfall of funds available to return to" MFGI customers who traded on foreign exchanges. (CAC ¶ 354.)

As a result of the events described above, MF Global filed for bankruptcy. MFGI was subjected to a liquidation proceeding filed by the Securities Investor

Protection Corporation, pursuant to SIPA. The Trustee was appointed to spearhead the liquidation.

### 2. *Allegations Against PwC*

PwC served as the independent auditor for MF Global and MFGI from 2010 to 2011. Pursuant to the regulations described above, PwC was required to review MFGI's policies and procedures for segregating and securing customer funds and to certify that those procedures were adequate.

In both March 2010 and May 2011, PwC presented its audit results to the MFGI Board of Directors and to MF Global in its capacity as MFGI's stockholder. Both reports affirmed that, in PwC's opinion, MFGI had adequate controls to safeguard customer funds in compliance with the CFTC Regulations.

Plaintiffs claim that PwC failed to detect material inadequacies in MFGI's internal policies and procedures. According to Plaintiffs, "PwC failed adequately to examine and evaluate MFGI's procedures and controls for protecting Customer Funds and failed adequately to test segregation calculations during the audit period and at fiscal year end." (CAC § 375.)

### D. *PROCEDURAL HISTORY*

On November 3, 2011, Joseph Deangelis brought the first action in this case. (Dkt. No. 1.) The Court has, as necessary, consolidated related actions under this docket. The Court has also accepted related cases transferred to this Court by the Judicial Panel on Multidistrict Litigation. (*See* Conditional MDL Transfer Orders, *In re: MF Global Holdings Ltd. Investment Litigation*, 12 MD 2338, Dkt. Nos. 1, 4, 7.)

By Order dated May 21, 2012, the Court designated Berger & Montague, P.C. and Entwistle & Cappucci LLP as Interim Co-Lead Counsel for the Customer Class and appointed an executive committee to determine case strategy. (Dkt. No. 292.) Plaintiffs filed the CAC on November 5, 2012. (Dkt. No. 382.) Defendants filed their motions to dismiss on January 16, 2013. (Dkt. Nos. 422, 426.) [8]

### III. *LEGAL STANDARD*

Rule 12(b)(6) permits dismissal of a complaint for "failure to state a claim upon which relief can be granted." Fed. R.Civ.P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (*quoting Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). This standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* A court should not dismiss a complaint for failure to state a claim if the factual allegations sufficiently "raise a right to relief above the speculative level." *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955. The task of a court in ruling on a motion to dismiss is "to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *In re Initial Pub. Offering Sec. Litig.,* 383 F.Supp.2d 566, 574 (S.D.N.Y.2005) (*quoting Levitt v. Bear Stearns & Co., Inc.,* 340 F.3d 94, 101 (2d Cir.2003)) (inter-

---

**8.** On February 6, 2013, at the request of all parties, Magistrate Judge James C. Francis IV ordered a stay of all proceedings in this action while the parties engaged in voluntary media-

tion. (Dkt. No. 456.) Magistrate Judge Francis lifted the stay on September 12, 2013. (Dkt. No. 538.)

nal quotation marks omitted), *aff'd sub nom., Tenney v. Credit Suisse First Bos. Corp.,* Nos. 05–3430–CV, 05–4759–CV, 05–4760–CV, 2006 WL 1423785 (2d Cir. May 19, 2006). A court must accept as true all well-pleaded factual allegations in the complaint, and draw all reasonable inferences in the plaintiff's favor. *See Chambers,* 282 F.3d at 152.

■ Federal Rule of Civil Procedure 8(a) ("Rule 8(a)") requires only a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R.Civ.P. 8(a)(2). Where Rule 8(a)'s pleading standard governs, "dismissal is improper as long as the complaint furnishes adequate notice of the basis of the plaintiff's claim ... and 'relief could be granted under [some] set of facts consistent with the allegations.'" *In re Global Crossing, Ltd. Sec. Litig.,* No. 02 Civ. 910, 2005 WL 2990646, at *8 (S.D.N.Y. Nov. 7, 2005) (alteration in original) (*quoting Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 512–14, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002)).

## IV. DISCUSSION

### A. CLAIMS AGAINST D & O DEFENDANTS

Counts One through Twelve of the CAC are brought against the D & O Defendants. Plaintiffs allege violations of the CEA and of the common law. The D & O Defendants move to dismiss all counts under Rule 12(b)(6).[9] The Court addresses these counts in turn.

#### 1. CEA Claims

In Counts One and Two, Plaintiffs charge the D & O Defendants with violations of Section 22. First, in Count One, they allege that Corzine and O'Brien engaged in direct violations of the CEA. Second, in Count Two, Plaintiffs claim that all of the D & O Defendants aided and abetted violations of the CEA.

#### a. Direct Violations

■ Section 22 provides a private right of action against a person who violated the CEA, but only where the plaintiff stands in a statutorily recognized relationship with the defendant. *See* 7 U.S.C. § 25(a)(1). Congress enacted this provision after the Supreme Court ruled that the CEA contained an implied private cause of action. *See Klein & Co. Futures, Inc. v. Board of Trade of N.Y.,* 464 F.3d 255, 262 (2d Cir.2006) (*citing Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran,* 456 U.S. 353, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982)). Section 22 expresses Congress's intent to limit the "circum-

9. The D & O Defendants also move under Federal Rule of Civil Procedure 12(b)(1) to dismiss some of the Trustee's claims for lack of subject matter jurisdiction. (D & O Defs.' Joint Mem. at 20–22; D & O Defs.' Joint Reply at 6–7.) The parties thus dispute whether the Trustee has standing to pursue claims on behalf of MFGI's customers or general creditors, either directly or as a bailee of customer funds. *See generally In re Bernard L. Madoff Inv. Sec. LLC (BLMIS),* 721 F.3d 54, 63–77 (2d Cir.2013) (reviewing SIPA trustee's standing to pursue claims on behalf of creditors and customers). While the Second Circuit rejected a trustee's standing arguments in *BLMIS, see id.* at 57–58, Plaintiffs offer several arguments to distinguish their claims on behalf of the Trustee (Pls.' Joint D & O Opp'n at 22–24).

The Court finds it unnecessary to resolve this dispute at this time. The D & O Defendants do not dispute Plaintiffs' claim that at least some plaintiffs have standing to pursue the claims made in each count of the CAC. (Pls.' Joint D & O Opp'n at 20–22.) Thus, even if the Court agreed with the D & O Defendants' standing argument, no count would be dismissed for lack of subject matter jurisdiction. The Court can resolve the exact parameters of which party or parties have standing to bring each claim after discovery is complete.

stances under which a civil litigant could assert a private right of action for a violation of the CEA or CFTC regulations." *Id.* (*citing* H.R. Rep. No. 97–565, pt. 1, at 57 (1982), *reprinted in* 1982 U.S.C.C.A.N. 3871, 3906). Section 22 thus "lays out what are in essence conditions precedent" to a private cause of action. *Three Crown Ltd. P'ship v. Caxton Corp.*, 817 F.Supp. 1033, 1042 (S.D.N.Y.1993) (internal quotation marks omitted); *see also In re Natural Gas Commodity Litig.*, 337 F.Supp.2d 498, 518 (S.D.N.Y.2004) ("[Section 22] delineates the four conditions under which a private party may file suit under the CEA."). To survive a motion to dismiss a claim for direct violations of the CEA under Section 22, a private plaintiff must plead facts to show both that the defendant violated the CEA and that the defendant "stand[s] in an appropriate relationship to the plaintiff with respect to" the alleged CEA violation. *Nicholas v. Saul Stone & Co. LLC*, 224 F.3d 179, 186 (3d Cir.2000); *see also Klein & Co.*, 464 F.3d at 259 (noting that private plaintiff must "fall within one of the four required relationships set forth in § 22(a)(1)(A–D)").

Plaintiffs rely on the second clause of Section 22(a)(1)(B). (Pls.' Joint D & O Opp'n at 27–28.) That clause permits a private CEA claim where the plaintiff "deposited with or paid to [the violator] money, securities, or property (or incurred debt in lieu thereof) in connection with any order to make such contract or any swap[.]" 7 U.S.C. § 25(a)(1)(B). But Plaintiffs plead no facts to show that they deposited any money, securities, or property with Corzine and O'Brien. They instead suggest that they made deposits with MFGI, and that liability attaches to Corzine and O'Brien by virtue of the fact

that they "had complete control and dominion" over those deposits. (CAC ¶¶ 424, 427.)

Plaintiffs cite no case to support the proposition that direct liability under the CEA attaches to the employee of a financial institution to which deposits are made. Although Plaintiffs rely on *Sundial International Fund Ltd. v. Delta Consultants Inc.*, 923 F.Supp. 38 (S.D.N.Y.1996) (Pls.' Joint D & O Opp'n at 28 n. 44), that case actually undercuts Plaintiffs' claim. In *Sundial*, the plaintiffs brought a CEA claim against two banks and an employee of one of those banks. 923 F.Supp. at 40–41. The court found that the plaintiffs had pled facts sufficient to show a relationship under Section 22(a)(1)(B)'s second clause as to the banks because the plaintiffs had paid money to the banks "in connection with" orders to make commodities contracts. *Id.* at 41. But the plaintiffs conceded that a Section 22(a)(1)(B) relationship did not exist as to the individual employee because the "money was not deposited with [the employee] or paid to [the employee], within the meaning of the second clause." *Id.*

Similarly, in *Rosner v. Peregrine Finance Ltd.*, No. 95 Civ. 10904, 1998 WL 249197 (S.D.N.Y. May 18, 1998)—another case on which Plaintiffs rely (Pls.' Joint D & O Opp'n at 29 n. 48)—the court found that a Section 22(a)(1)(B) relationship existed between plaintiffs and a financial institution with which funds were deposited. *Rosner*, 1998 WL 249197, at *7. *Rosner* and *Sundial* suggest that Plaintiffs could bring claims against MFGI for direct violations of the CEA. But neither case—nor, it seems, any other case [10]—suggests that

---

10. The only other case Plaintiffs cite in support of their claim (Pls.' Joint D & O Opp'n at 29 n. 48) is *In re Griffin Trading Co.*, 683 F.3d 819 (7th Cir.2012). That case found the indi-

vidual principals of a financial firm liable on a theory of breach of fiduciary duty, not for direct violations of the CEA. *Id.* at 825–26. The court referred to the principals' violations

Section 22(a)(1)(B) permits a private plaintiff to sue an individual employee of a financial institution for CEA violations.[11]

Because Plaintiffs have not adequately alleged a Section 22 relationship with Corzine and O'Brien, the Court grants the motion to dismiss Count I of the CAC.

### b. *Aiding and Abetting*

Section 22 permits a private plaintiff to hold liable a person "who willfully aids, abets, counsels, induces, or procures the commission of a violation of" the CEA. 7 U.S.C. § 25(a)(1).[12] The CEA thus creates "a private cause of action against an aider and abettor who aids and abets a principal in undertaking one of the specifically enumerated transactions in subsections (A) through (D)." *Damato v. Hermanson*, 153 F.3d 464, 471 (7th Cir.1998). The D & O Defendants do not dispute that MFGI committed such primary violations. (D & O Defs.' Joint Mem. at 29.) Thus, the Court must determine whether Plaintiffs have sufficiently alleged that each of the D & O Defendants aided and abetted MFGI's primary violations.

■ "[T]he standard for aiding and abetting liability under 7 U.S.C. § 25 is the same as for criminal aiding and abetting under 18 U.S.C. § 2." *In re Amaranth Natural Gas Commodities Litig.*, 730 F.3d 170, 183 (2d Cir.2013); *accord Nicholas*, 224 F.3d at 189; *Damato*, 153 F.3d at 473. The Third and Seventh Circuits have applied a three-part test to Section 22's aiding-and-abetting standard, requiring plaintiffs to prove that the defendant "(1) had knowledge of the principal's ... intent to commit a violation of the [CEA]; (2) had the intent to further that violation; and (3) committed some act in furtherance of the principal's objective." *Damato*, 153 F.3d at 473; *accord Nicholas*, 224 F.3d at 189. Courts in this district have adhered to that test. *See In re Platinum & Palladium Commodities Litig.*, 828 F.Supp.2d 588, 599 (S.D.N.Y.2011); *In re Natural Gas Commodity Litig.*, 337 F.Supp.2d at 511.

The Second Circuit recently declined to adopt this precise formulation of the standard. *See Amaranth*, 730 F.3d at 182. Relying on its traditional statement of aiding-and-abetting liability in *United States v. Peoni*, 100 F.2d 401 (2d Cir.1938), the Circuit Court held that "in evaluating a complaint alleging the aiding and abetting of a violation of the CEA, allegations about the defendant's knowledge, intent, and ac-

---

of the CFTC Regulations only in the context of damages. *Id.* at 826.

11. Section 22 restricts only actions by private plaintiffs, and not those by the CFTC. Thus, by amended complaint dated December 6, 2013, the CFTC has brought claims against Corzine, O'Brien, and MF Global for direct violations of the CEA. (Dkt. No. 587.) By Order dated January 17, 2014, the Court denied Corzine's and O'Brien's motions to dismiss that complaint. *Deangelis v. Corzine*, No. 11 Civ. 7866, 2014 WL 216474 (S.D.N.Y. Jan. 17, 2014).

12. The CAC states that this claim is also brought under Section 13, 7 U.S.C. § 13c. (CAC ¶ 430.) As the D & O Defendants correctly note (D & O Defs.' Joint Mem. at 29), private plaintiffs can bring claims only under Section 22, and cannot bring claims under Section 13. *See* 7 U.S.C. § 25(a)(2) (providing, absent exceptions not relevant here, that Section 22 creates "the exclusive remedies under [the CEA]" for private plaintiffs); *Klein & Co.*, 464 F.3d at 259 ("CEA § 22 enumerates the only circumstances under which a private litigant may assert a private right of action for violations of the CEA."); *Kolbeck v. LIT Am., Inc.*, 923 F.Supp. 557, 568 (S.D.N.Y. 1996) (noting that private plaintiffs are "explicitly barred" from making claims under Section 13). In their opposition brief, Plaintiffs rest their arguments entirely on Section 22's aiding-and-abetting provision. (*See* Pls.' Joint D & O Opp'n at 29–35.) The Court thus considers whether Count Two succeeds only under Section 22.

tions should not be evaluated in isolation, but rather in light of the complaint as a whole." *Amaranth,* 730 F.3d at 183. The court emphasized that the three components of the aiding-and-abetting test—knowledge, intent, and action in furtherance of the violation—"cannot be considered in isolation from one another." *Id.* at 185 n. 18 (*quoting SEC v. Apuzzo,* 689 F.3d 204, 214 (2d Cir.2012)) (internal quotation marks omitted). Although it declined to follow the precise articulation used in *Damato* and *Nicholas,* the Second Circuit did note that its standard does not "differ, in substance, from the standard employed by the Seventh and Third Circuits." *Id.* at 182.

■ The Court is persuaded that Plaintiffs have pled facts sufficient to give rise to plausible claims against defendants Corzine, Steenkamp, Abelow, O'Brien, Dunne, and Mahajan. As to those defendants, the CAC alleges facts sufficient to support a reasonable inference that they knew about the worsening liquidity crisis and the strategy, approved by Corzine and Steenkamp, to use Firm Invested in Excess and Regulatory Excess to cover for MF Global's lack of liquidity. These defendants also received reports indicating that the firm's share of customer accounts was quickly decreasing. Nonetheless, these defendants continued to participate in the "shell game," as characterized by O'Brien, of shuffling money from customer accounts between MFGI and MF Global's proprietary operations. This participation is, in the Court's view, sufficient to permit an inference of intent to further MFGI's eventual violation of the CEA. And, from the facts alleged, the Court finds it reasonable to infer that these defendants knew that the "shell game" would eventually result in misuse of customer funds. The Court thus denies the motion to dismiss as

to defendants Corzine, Steenkamp, Abelow, O'Brien, and Mahajan.

■ However, as for defendants Serwinski and Ferber, the Court is not persuaded that Plaintiffs have plausibly alleged their liability for aiding and abetting. Defendant Serwinski warned Corzine, Steenkamp, and others about the risks of dipping into the firm's excess portion of customer accounts. On at least two occasions, Serwinski contacted O'Brien to question her transfers from the FCM to MF Global's other operations. From the facts alleged, the Court is not persuaded that Serwinski had the intent to further any violation of the CEA or took any act in furtherance of that objective. To the contrary, Serwinski took steps to attempt to prevent that violation, insofar as her position allowed.

■ Similarly, the Court is not persuaded that Ferber intended to further any violation of the CEA or took any act in furtherance of the objective. Plaintiffs emphasize that MF Global's internal audit department, which Ferber headed, repeatedly warned about the deficiencies in the company's risk management and internal controls. (Pls.' Omnibus D & O Opp'n at 26.) This observation cuts against Plaintiffs' claims—that Ferber attempted to prevent internal controls from failing suggests that she did not assist MFGI's violation of the CEA. While Plaintiffs allege that Ferber was involved in some meetings and other communications with regulators about segregation of customer funds (Pls.' Omnibus D & O Opp'n at 28–29), nothing about those communications plausibly suggests that Ferber participated in the illegal transfer of funds from customer accounts or intended for that result to occur.

The Court thus grants the motion to dismiss Count Two with respect to defendants Serwinski and Ferber and denies the

motion as to the remaining D & O Defendants.

### 2. *Common Law Claims*

Counts Three through Twelve of the CAC state common law claims against the D & O Defendants. Plaintiffs allege that all of the D & O Defendants are liable for breach of fiduciary duty (Counts Three, Five, and Eleven); aiding and abetting breaches of fiduciary duty (Count Four); negligence (Counts Six and Seven); tortious interference with contract and business advantage (Count Eight); and aiding and abetting a breach of bailment (Count Twelve). Plaintiffs additionally bring claims against Corzine and O'Brien for conversion (Count Nine) and aiding and abetting conversion (Count Ten).

#### a. *Choice of Law*

■ The parties agree that New York law applies to Counts Four, Six, Seven, Eight, Nine, Ten, and Twelve. But they dispute which state's law applies to Plaintiffs' breach of fiduciary duty claims (Counts Three, Five, and Eleven). The D & O Defendants claim that the internal affairs doctrine requires the Court to apply the law of Delaware, where MFGI was incorporated. (D & O Defs.' Joint Mem. at 32 n. 35; D & O Defs.' Joint Reply at 12–13.) Plaintiffs respond that New York law should apply under the interest analysis test. (Pls.' Joint D & O Opp'n at 35–37.)

■ The Court must apply the choice-of-law rules of the state in which each action originated. *See Van Dusen v. Barrack,* 376 U.S. 612, 639–40, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964); *In re Parmalat Sec. Litig.,* 479 F.Supp.2d 332, 340 (S.D.N.Y.

2007). Here, the actions for breach of fiduciary duty all originated in either New York or Illinois.[13] Both New York and Illinois recognize the internal affairs doctrine. *See, e.g., CDX Liquidating Trust v. Venrock Assocs.,* 640 F.3d 209, 212 (7th Cir.2011); *KDW Restructuring & Liquidation Servs. LLC v. Greenfield,* 874 F.Supp.2d 213, 221 (S.D.N.Y.2012). As outlined in the Restatement (Second) of Conflict of Laws, the internal affairs doctrine provides that

> [t]he local law of the state of incorporation will be applied to determine the existence and extent of a director's or officer's liability to the corporation, its creditors and shareholders, *except* where, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the parties and the transaction, in which event the local law of the other state will be applied.

Restatement (Second) of Conflict of Laws § 309 (1971) (emphasis added).

■ Thus, the internal affairs doctrine creates "a presumption in favor of applying the law of the state of incorporation." *Resolution Trust Corp. v. Gregor,* 872 F.Supp. 1140, 1150 (E.D.N.Y.1994). But the presumption is not irrebuttable; if there is a state with "a more significant relationship with the parties and the dispute at issue," the court should apply that state's law. *Id.* (internal quotation marks omitted); *see also Tyco Int'l, Ltd. v. Kozlowski,* 756 F.Supp.2d 553, 560 (S.D.N.Y. 2010) ("In New York, the internal affairs doctrine is applied only as one factor in an analysis where 'the law of the state with the greatest interest in the issue governs.'" (*quoting BBS Norwalk One, Inc. v. Raccolta, Inc.,* 60 F.Supp.2d 123, 129

---

**13.** While one action in this matter was filed in Montana, that complaint did not contain any

claims alleging a breach of fiduciary duty.

(S.D.N.Y.1999))); *Kolson v. Vembu*, 869 F.Supp. 1315, 1323 (N.D.Ill.1994) (finding, under Illinois's choice-of-law rule, that "recourse to the place of incorporation is not simply a matter of slavish adherence").

Here, the Court is persuaded that New York and Illinois have a more significant relationship than Delaware has with this dispute such that the law of those states should apply to this action. New York and Illinois are "[t]he forum[s] with the greatest contact and interest in this action" because the alleged "breaches of duty were masterminded" there. *Anwar v. Fairfield Greenwich Ltd. (Anwar II )*, 728 F.Supp.2d 372, 400 n. 8 (S.D.N.Y.2010); *see also Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 446 F.Supp.2d 163, 194 (S.D.N.Y. 2006) (applying New York law to a claim for breach of fiduciary duty "[b]ecause occurrences in New York and the parties' contacts with that forum bear the most relation to the torts at issue"). Other than its role as the place of incorporation, Delaware has no meaningful relationship to the events giving rise to this action. *See id.;* Restatement (Second) of Conflict of Laws § 309 cmt. c (1971) (noting that internal affairs doctrine carries less weight "where

the corporation has little contact with the state of its incorporation"). Moreover, as applies to the Customers, this case does not concern "a director's or officer's liability to the corporation, its creditors and shareholders," Restatement (Second) of Conflict of Laws § 309 (1971), which again makes the internal affairs doctrine less relevant here.[14]

As between New York law and Illinois law, the elements of a fiduciary duty claim "are not materially different." *Seippel v. Jenkens & Gilchrist, P.C.*, 341 F.Supp.2d 363, 382 n. 137 (S.D.N.Y.2004). Therefore, the Court applies New York law to Plaintiffs' breach of fiduciary duty claims. *See Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 672 F.3d 155, 157 (2d Cir. 2012) (noting that where there is no actual conflict in the substantive law, New York courts apply New York law); *In re Refco Inc. Sec. Litig. (Refco II )*, 826 F.Supp.2d 478, 500–01 (S.D.N.Y.2011) (same).

### b. *Breach of Fiduciary Duty*

 In Counts Three, Five, and Eleven, Plaintiffs allege that each of the D & O Defendants breached a fiduciary duty to the Customer Class.[15] In New York, the

---

**14.** Plaintiffs concede that Delaware law "may apply to the Trustee's claims against the D & O Defendants based on the corporate duties they owed." (Pls.' Joint D & O Opp'n at 37.) As noted below, the Trustee's fiduciary duty claims in Counts Five and Twelve are waived, and the Trustee's negligence claims based on duties owed to MFGI fail under the economic loss doctrine. Neither outcome would change if Delaware law applied.

**15.** In Counts Five and Eleven, Plaintiffs, as assignees of the Trustee, also allege that the D & O Defendants breached fiduciary duties to MFGI. The D & O Defendants moved to dismiss on the grounds that they owed fiduciary duties only to MF Global. (D & O Defs.' Joint Mem. at 34–36; D & O Defs.' Joint Reply at 13–14.) Plaintiffs' opposition did not contest these grounds for dismissal; it argued only

that the D & O Defendants owed fiduciary duties to the Customers. (Pls.' Joint D & O Opp'n at 40–45.) The Court thus deems their claim to be waived. *See Lipton v. County of Orange, N.Y.*, 315 F.Supp.2d 434, 446 (S.D.N.Y.2004) ("This Court may, and generally will, deem a claim abandoned when a plaintiff fails to respond to a defendant's arguments that the claim should be dismissed."). Moreover, the Court notes that the general rule is that directors and officers of a wholly owned subsidiary—such as MFGI—owe fiduciary duties only to the parent corporation, not to the subsidiary. *See, e.g., Aviall, Inc. v. Ryder Sys., Inc.*, 913 F.Supp. 826, 832 (S.D.N.Y.1996) ("When one company wholly owns another, the directors of the parent and the subsidiary are obligated to manage the affairs of the subsidiary in the best interests only of the parent and its shareholders.").

elements of a claim for breach of fiduciary duty "are 'breach by a fiduciary of a duty owed to plaintiff; defendant's knowing participation in the breach; and damages.'" *Pension Comm.*, 446 F.Supp.2d at 195 (*quoting SCS Commuc'ns, Inc. v. Herrick Co.*, 360 F.3d 329, 342 (2d Cir.2004)). A fiduciary relationship arises where "one party's superior position or superior access to confidential information is so great as virtually to require the other party to repose trust and confidence in the first party," and the defendant was "under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation." *Id.* at 195–96 (citation and internal quotation marks omitted). "Broadly stated, a fiduciary relationship is one founded upon trust or confidence reposed by one person in the integrity and fidelity of another." *Refco II*, 826 F.Supp.2d at 502–03 (*quoting Penato v. George*, 52 A.D.2d 939, 383 N.Y.S.2d 900, 904–05 (2d Dep't 1976)) (internal quotation mark omitted).

 It is well-established that, as an FCM, MFGI owed a fiduciary duty to its customers. *See Sherman v. Sokoloff*, 570 F.Supp. 1266, 1269 n. 10 (S.D.N.Y.1983) ("[T]he FCM is indeed an agent of the client and owes him, accordingly, a fiduciary duty." (citations omitted)); *see also Oxford Organisation, Ltd. v. Peterson (In re Stotler & Co.)*, 144 B.R. 385, 389 n. 7 (N.D.Ill.1992) ("[Section 4d] does establish a fiduciary duty between the FCM and the customer."). Plaintiffs' argument is, in essence, that because the D & O Defendants controlled MFGI, then the D & O Defendants also owed a fiduciary duty to the Customers. (Pls.' Joint D & O Opp'n at

41.) The Second Circuit's recent summary order in *Krys v. Butt*, 486 Fed.Appx. 153 (2d Cir.2012), squarely precludes such use of "derivative" allegations to prove a breach of fiduciary duty.

In *Krys*, the plaintiffs sued "an officer . . . who oversaw *all* of [his company's] commodity pools." *Id.* (emphasis in original). The Circuit Court rejected that claim and held that "[s]uch derivative allegations are legally insufficient to state a claim for breach of fiduciary duty against [the officer]." *Id. Krys* confirms earlier cases from this District that declined to hold an officer liable for his company's breaches of fiduciary duty. *See Refco II*, 826 F.Supp.2d at 512 (dismissing fiduciary duty claim as to corporation's president, CEO, and member of board of trustees even though corporation breached fiduciary duty to the plaintiffs); *American Fin. Int'l Grp.-Asia, L.L.C. v. Bennett*, No. 05 Civ. 8988, 2007 WL 1732427, at *4–5 (S.D.N.Y. June 14, 2007) (dismissing fiduciary duty claims against individual officers because, even if company breached a fiduciary duty, "nothing in the complaint suggests that any relationship existed between plaintiffs and [company's] individual officers"); *A.I.A. Holdings, S.A. v. Lehman Bros., Inc.*, No. 97 Civ. 4978, 1999 WL 47223, at *6 (S.D.N.Y. Feb. 3, 1999) (finding that under New York law no fiduciary duty exists between customers and "a controlling shareholder, officer, or director of a corporation"). The principle that Plaintiffs espouse "would make *any* corporate official strictly bound by *all* fiduciary duties of the corporation, regardless of the official's own actions, position, or

---

The Court further notes that the trustee for MF Global has brought a complaint against Corzine, Abelow, and Steenkamp for breaches of fiduciary duties owed to MF Global. (*See* Dkt. No. 22 in *Freeh et al. v. Corzine et al.*, Adv. Pro. No. 13–01333 (Bankr.S.D.N.Y.).)

By Order dated January 14, 2014, the Court withdrew its reference of that action to the Bankruptcy Court and ordered that the complaint be consolidated under this docket. (Dkt. No. 622.)

even awareness. That is not the law." *Krys*, 486 Fed.Appx. at 156 n. 4 (emphases in original).

Plaintiffs attempt to save their claim by arguing that "[m]atters relating to risk were the responsibility of every employee" and that the Customers "relied on the D & O Defendants to . . . comply with the legal and regulatory requirements to maintain Customer Funds in Segregated and Secured Accounts." (Pls. Joint D & O Opp'n at 44–45.) But the D & O Defendants bore those responsibilities in their capacity as employees of MFGI, not because of their relationship with the Customers. Put another way, Plaintiffs' allegations are not sufficient to extend the relationship of trust and confidence between the Customers and MFGI into such a relationship between the Customers and the D & O Defendants. *See Krys*, 486 Fed.Appx. at 156 (affirming dismissal where complaint "failed to indicate that there was anything about [the officer's] role as a corporate official that created a personal relationship of trust and confidence").

The Court is persuaded that the CAC contains a derivative claim of the type that *Krys* rejected. The Court thus grants the motion to dismiss Counts Three, Five, and Eleven.[16]

#### c. *Aiding and Abetting Breach of Fiduciary Duty*

■■■■ To state a claim for aiding and abetting a breach of fiduciary duty, a plaintiff must show: "(1) breach of fiduciary obligations to another of which the aider and abettor had actual knowledge; (2) the defendant knowingly induced or participated in the breach; and (3) plaintiff suffered actual damages as a result of the breach." *Kottler v. Deutsche Bank AG*, 607 F.Supp.2d 447, 466 (S.D.N.Y.2009). A plaintiff must plead actual knowledge, as opposed to constructive knowledge. *See Krys*, 486 Fed.Appx. at 157. But the actual knowledge prong can also be met by pleading facts sufficient give rise to a strong inference of conscious avoidance of actual knowledge, "such that it can almost be said that the defendant actually knew because he or she suspected a fact and realized its probability, but refrained from confirming it in order later to be able to deny knowledge." *Kirschner v. Bennett*, 648 F.Supp.2d 525, 544 (S.D.N.Y.2009) (internal quotation marks omitted). "The Court will not spare a putative aider and abettor who consciously avoids confirming facts that, if known, would demonstrate the fraudulent nature of the endeavor he or she substantially furthers." *Anwar II*, 728 F.Supp.2d at 442–43 (internal quotation marks omitted).

■■■■ Plaintiffs claim that the D & O Defendants aided and abetted MFGI's breaches of fiduciary duty. (Pls.' Joint D & O Opp'n at 52.) An FCM owes its

---

**16.** In a footnote (Pls.' Joint D & O Opp'n at 44 n. 74), Plaintiffs cite *Claybrook v. Morris (In re Scott Acquisition Corp.)*, 344 B.R. 283 (Bankr.D.Del.2006). That case suggests that if MFGI were insolvent, then officers of MFGI would owe fiduciary duties to the Customers as creditors of MFGI. *See id.* at 290 ("[U]pon insolvency directors of a wholly-owned subsidiary owe fiduciary duties to the subsidiary *and its creditors.*" (emphasis added)). But it is not clear from the footnote whether Plaintiffs intend to claim that any of the D & O Defendants owed fiduciary duties to the Cus-

tomers because MFGI was allegedly insolvent. Regardless, as the D & O Defendants persuasively argue (D & O Defs.' Joint Mem. at 38–39; D & O Defs.' Joint Reply at 17 n. 15), MFGI's insolvency still would not permit the Customers to bring claims against the D & O Defendants for breach of fiduciary duty. *See Fox v. Koplik (In re Perry H. Koplik & Sons, Inc.)*, 476 B.R. 746, 797 (Bankr.S.D.N.Y. 2012) ("[W]ith or without insolvency, neither shareholders nor creditors would have direct claims [against officers] for breaches of duties owed to the corporation.").

clients a fiduciary duty. *See Sherman,* 570 F.Supp. at 1269 n. 10. The D & O Defendants suggest that the contract between each customer and MFGI limits the scope of that duty and thus prevents Plaintiffs from showing that any fiduciary duty was breached. (D & O Defs.' Joint Mem. at 50–51.) But any contract between MFGI and each customer could not eliminate MFGI's duty to keep customer funds segregated in accordance with the CFTC Regulations, as described earlier in this opinion. And here, accepting Plaintiffs' allegations to be true, customer funds clearly were transferred in violation of those rules. Plaintiffs have thus pled sufficient facts to defeat the D & O Defendants' claim.

The D & O Defendants also argue that Plaintiffs have failed to establish actual knowledge or conscious avoidance. (D & O Defs.' Joint Mem. at 51–53.) And they further claim that Plaintiffs have failed to demonstrate that they participated in the primary violation through acts, rather than merely omissions. (D & O Defs.' Joint Mem. at 53.) Where a defendant does not owe an independent fiduciary duty, he or she can be an aider and abettor only through affirmative acts that provide substantial assistance to the primary violator. *See Kolbeck v. LIT Am., Inc.,* 939 F.Supp. 240, 247 (S.D.N.Y.1996).

The Court is persuaded that Plaintiffs have established (1) either actual knowledge or conscious avoidance and (2) participation in the primary violation by defendants Corzine, Steenkamp, Abelow, O'Brien, Dunne, and Mahajan. These defendants knew of the liquidity crisis and its increasing impact on the firm's excess share of customer accounts. Even in light of that knowledge, they continued to transfer money from MFGI to MF Global's other operations as part of MF Global's "shell game." That participation is, in the

Court's view, sufficient to demonstrate substantial assistance to MFGI's breach of fiduciary duty and either knowledge or conscious avoidance of the eventual misuse of customer funds. The Court thus denies the motion to dismiss Count Four as to defendants Corzine, Steenkamp, Abelow, O'Brien, and Mahajan.

As with Count Two, however, the Court grants the motion to dismiss Count Four with respect to Serwinski and Ferber. Based on the facts alleged in the CAC, the Court cannot reasonably infer that those two defendants provided substantial assistance to MFGI's breach of fiduciary duty. To the contrary, Serwinski warned against improper use of Regulatory Excess, and Ferber, through her role as head of the internal audit department, repeatedly warned the other officers about weaknesses in MF Global's internal controls. For those reasons, the Court grants the motion to dismiss Count Four with respect to defendants Serwinski and Ferber.

d. *Conversion and Aiding and Abetting Conversion*

"According to New York law, '[c]onversion is the unauthorized assumption and exercise of the right of ownership over goods belonging to another to the exclusion of the owner's rights.'" *Kirschner,* 648 F.Supp.2d at 540 (alteration in original) (*quoting Thyroff v. Nationwide Mut. Ins. Co.,* 460 F.3d 400, 403–04 (2d Cir.2006)). "To withstand a motion to dismiss in a conversion claim, a plaintiff must allege: '(1) the property subject to conversion is a specific identifiable thing; (2) plaintiff had ownership, possession or control over the property before its conversion; and (3) defendant exercised an unauthorized dominion over the thing in question, to the alteration of its condition or to the exclusion of the plaintiff's

rights.' " *Id.* (*quoting Moses v. Martin,* 360 F.Supp.2d 533, 541 (S.D.N.Y.2004)). A corporate officer can be liable for conversion even when acting on behalf of his or her employer. *See LoPresti v. Terwilliger,* 126 F.3d 34, 42 (2d Cir.1997).

Corzine and O'Brien first claim that they did not exercise unauthorized dominion over customer funds because the contract between the Customers and MFGI authorized MFGI's use of those funds. (D & O Defs.' Joint Mem. at 54–57.) But Plaintiffs allege that Corzine and O'Brien transferred customer funds that the CEA and the CFTC Regulations required to be segregated and not used for MFGI's proprietary purposes. A claim for conversion lies when funds given to a party for one purpose—here, to facilitate trades in futures contracts, subject to segregation in compliance with the CEA and CFTC Regulations—is used for another purpose—here, to cover MFGI's and MF Global's debts. *See Lawson v. Full Tilt Poker Ltd.,* 930 F.Supp.2d 476, 487–88 (S.D.N.Y.2013) (rejecting motion to dismiss conversion claim where funds that were assured to be segregated "in fact were improperly comingled with [the defendant company's] operational funds"). The Court is persuaded that the CAC contains sufficient facts to enable it to draw a reasonable inference that Corzine and O'Brien exercised unauthorized dominion over customer funds.

Corzine and O'Brien also claim that the Customers' proper remedy for any conversion violation is a breach-of-contract claim against MFGI. (D & O Defs.' Joint Mem. at 57.) "Generally, breach of contract does not give rise to liability in tort unless a legal duty independent of the contract itself has been violated." *Deutsche Bank Sec., Inc. v. Rhodes,* 578 F.Supp.2d 652, 670 (S.D.N.Y.2008); *see also In re Refco Sec. Litig.* (*Refco I* ), 759 F.Supp.2d 301, 327 (S.D.N.Y.2010) ("Where a conversion claim is grounded in a contractual dispute, the plaintiff 'must show acts that were unlawful or wrongful as opposed to mere violations of contractual rights.' " (*quoting Moses,* 360 F.Supp.2d at 541)). Plaintiffs plead violations of the CEA and the CFTC Regulations that are independent of the contract itself. Moreover, when "there is no remedy in contract"—as is true here, in light of MFGI's bankruptcy—and "the only remedy [for the injured party] is in tort," courts do not preclude the injured party from proceeding on a conversion theory. *Kirschner,* 648 F.Supp.2d at 543. For these reasons, the Court is not persuaded that the conversion claim should be dismissed.

Finally, Plaintiffs also bring a claim for aiding and abetting conversion. "Under New York law, the elements of aiding and abetting a breach of fiduciary duty [and] aiding and abetting a conversion ... are substantially similar." *Id.* at 533. The Court determined that the CAC survives the motion to dismiss claims against Corzine and O'Brien for aiding and abetting breach of fiduciary duty. For similar reasons, the Court denies the motion to dismiss the claims against them for aiding and abetting conversion.

e. *Negligence*

Counts Six and Seven of the CAC state claims against all of the D & O Defendants for negligence. Count Six is brought on behalf of the Customers and the Trustee for breach of duties relating to the segregation of Customer Funds, and Count Seven is brought on behalf of the Trustee for breach of duties to MFGI which led to its bankruptcy.

In order to state a claim for negligence, a plaintiff must allege " (1) that the defendant owed him or her a cogniza-

ble duty of care; (2) that the defendant breached that duty; and (3) that the plaintiff suffered damage as a proximate result of that breach." *Di Benedetto v. Pan Am World Serv., Inc.*, 359 F.3d 627, 630 (2d Cir.2004). The D & O Defendants claim only that Plaintiffs have not demonstrated the existence of a duty of care. "The existence and scope of an alleged tortfeasor's duty is, in the first instance, a legal question for determination by the court." *Di Ponzio v. Riordan*, 89 N.Y.2d 578, 657 N.Y.S.2d 377, 679 N.E.2d 616, 618 (1997).

 The P & O Defendants first argue that they owed no duty to the Plaintiffs under the economic loss doctrine. (P & O Defs.' Joint Mem. at 59–60.) The economic loss doctrine requires a "policy-driven scrutiny of whether a defendant had a duty to protect a plaintiff against purely economic losses." *King Cnty., Wash. v. IKB Deutsche Industriebank AG*, 863 F.Supp.2d 288, 302 (S.D.N.Y.2012).[17] Plaintiffs who enter into transactions that are of a contractual nature—even if no contract exists—are limited to "the benefits of their bargains" unless they can show "a legal duty separate and apart from obligations bargained for and subsumed within the transaction." *Id.* at 302–03; *see also Hydro Investors, Inc. v. Trafalgar Power Inc.*, 227 F.3d 8, 16 (2d Cir.2000) ("[C]ourts have applied the economic loss [doctrine] to prevent the recovery of damages that are inappropriate because they actually lie in the nature of breach of contract as opposed to tort.").

With respect to Count Six, this argument fails for the same reason that the Court denied the motion to dismiss claims for aiding and abetting conversion. The CEA and CFTC Regulations created a separate legal duty owed by an FCM to the Customers, apart from any contract between the Customers and MFGI. The Court thus rejects application of the economic loss doctrine to bar the negligence claims raised in Count Six.

 But the Court reaches a different result with respect to Count Seven. The CEA and CFTC Regulations did not create any obligations for the D & O Defendants with respect to MFGI. Rather, any legal duties raised in Count Seven arise from the contractual relationship between MFGI and its employees. Legal claims for breaches of those duties sound in contract, not tort. And while Plaintiffs object that the Trustee has no grounds for recovery against the D & O Defendants in a contract claim (Pls.' Joint D & O Opp'n at 65–66), the lack of contractual remedy is irrelevant to this analysis. *See King Cnty.*, 863 F.Supp.2d at 303 ("[T]he [economic loss] doctrine may apply even when there is no contract at all between the parties."). Because MFGI failed to negotiate a contractual duty with its employees, the Trustee, as successor-in-interest to MFGI, cannot now impose, through a tort claim, a duty for which MFGI did not bargain in contract. The Court thus grants the motion to dismiss Count Seven.

Turning again to Count Six, the D & O Defendants next argue that they cannot be held liable for any breaches of that duty to the Customers because these defendants did not participate in the unlawful conduct Plaintiffs allege. (D & O Defs.' Joint Mem. at 60–63.) The parties agree that the D & O Defendants can be held liable only if they affirmatively participated in the wrongful conduct at issue; they cannot be held liable for the mere failure to act.

---

**17.** The economic loss doctrine is distinct from the so-called "economic loss rule," which applies only in products liability cases and thus is irrelevant here. *See King Cnty.*, 863 F.Supp.2d at 302 (*citing 532 Madison Avenue Gourmet Foods, Inc. v. Finlandia Center, Inc.*, 96 N.Y.2d 280, 727 N.Y.S.2d 49, 750 N.E.2d 1097, 1101 (2001)).

See Airlines Reporting Corp. v. Aero Voyagers, Inc., 721 F.Supp. 579, 585 (S.D.N.Y. 1989); Peguero v. 601 Realty Corp., 58 A.D.3d 556, 873 N.Y.S.2d 17, 21 (1st Dep't 2009).

The Court does not view this issue as materially different from the question raised in Count Four as to whether each defendant provided substantial assistance to MFGI's breach of fiduciary duty. There, as here, the question was whether each defendant affirmatively participated in illegal transfers of customer funds. Therefore, for the same reasons as applied to Count Four, the Court grants the motion to dismiss Count Six with respect to defendants Serwinski and Ferber and denies the motion with respect to defendants Corzine, Steenkamp, Abelow, O'Brien, Dunne, and Mahajan.

### f. Tortious Interference with Contract and Business Advantage

▉▉▉▉ Count Eight contains claims against the D & O Defendants for tortious interference with contract or, in the alternative, tortious interference with business advantage. "To state a contract-interference claim under New York law, a plaintiff must demonstrate the existence of a valid contract, the defendant's knowledge of the contract's existence, that the defendant intentionally procured a contract breach, and the resulting damages to the plaintiff." Catskill Dev., L.L.C. v. Park Place Entm't Corp., 547 F.3d 115, 124–25 (2d Cir.2008); see also Finley v. Giacobbe, 79 F.3d 1285, 1294 (2d Cir.1996). The defendant must be a third party—that is, he or she may not be a party to the contract at issue. See Finley, 79 F.3d at 1295. An employee of a party to the contract can be a third party only if "the defendant-employee has exceeded the bounds of his or her authority." Id. (citing Kosson v. Algaze, 203 A.D.2d 112, 610 N.Y.S.2d 227, 228–29 (1st

Dep't 1994), aff'd, 84 N.Y.2d 1019, 622 N.Y.S.2d 674, 646 N.E.2d 1101 (1995)).

The D & O Defendants claim that there is no evidence that they induced a breach of contract. (D & O Defs.' Joint Mem. at 67–68.) With respect to defendants Serwinski and Ferber, the Court is again persuaded that Plaintiffs fail to allege that those defendants engaged in conduct sufficient to plausibly show that they induced MFGI to improperly transfer funds from customer accounts. The Court thus grants the motion to dismiss Count Eight with respect to defendants Serwinski and Ferber. As to the remaining D & O Defendants, the Court finds that the facts pled in the CAC give rise to reasonable inferences that those defendants did induce the breach of contract.

The D & O Defendants also move to dismiss for Plaintiffs' failure to show that they acted outside the scope of their authority. (D & O Defs.' Joint Mem. at 66–67.) With respect to this requirement, the parties dispute whether Plaintiffs must demonstrate that the D & O Defendants acted with the motive for personal gain, rather than with the motive for corporate gain. Some cases suggest that a plaintiff must show that a corporate officer acted both outside the scope of his authority and acted for personal gain. See Rockland Exposition, Inc. v. Alliance of Automotive Serv. Providers of N.J., 894 F.Supp.2d 288, 338 (S.D.N.Y.2012); Joan Hansen & Co., Inc. v. Everlast World's Boxing Headquarters Corp., 296 A.D.2d 103, 744 N.Y.S.2d 384, 390–91 (1st Dep't 2002). Other cases suggest that the plaintiff must show either that the officer acted outside the scope of his authority or acted for personal gain. See Friedman v. Wahrsager, 848 F.Supp.2d 278, 298 (E.D.N.Y.2012); Petkanas v. Kooyman, 303 A.D.2d 303, 759 N.Y.S.2d 1, 2 (1st Dep't 2003).

Regardless of the exact requirements, the D & O Defendants essentially raise fact questions about whether their conduct was outside the scope of their employment, whether their motive was for corporate gain, or whether they intended to induce a breach of contract. These factual disputes and questions involving states of mind cannot be disposed of at this stage of the proceedings, absent a fuller evidentiary record. The facts in the CAC give rise to reasonable inferences that run counter to the D & O Defendants' claims. The CAC thus survives a motion to dismiss on these grounds.

 As an alternative basis for Count Eleven, Plaintiffs allege tortious interference with business advantage. A claim for that tort lies where "(1) the plaintiff had business relations with a third party; (2) the defendant interfered with those business relations; (3) the defendant acted for a wrongful purpose or used dishonest, unfair, or improper means; and (4) the defendant's acts injured the relationship." *Catskill Dev.*, 547 F.3d at 132. A plaintiff can allege this claim as an alternative to a tortious interference with contract claim and proceed on this theory if the basis for the contract claim might not be viable after discovery. *See G–I Holdings, Inc. v. Baron & Budd*, 238 F.Supp.2d 521, 535–36 (S.D.N.Y.2002). Thus, while the D & O Defendants claim that there was no business relationship between the Customers and MFGI other than their contracts (D & O Defs.' Joint Mem. at 68–69), that is exactly the point—the business advantage claim will lie only if the contract claim does not. To the extent the D & O Defendants argue that they did not act for a wrongful purpose (D & O Defs.' Joint Mem. at 69–70), the Court again is persuaded—with respect to all D & O Defendants except Serwinski and Ferber—that this contention raises questions of fact and states of mind to be resolved after discovery.

For these reasons, the Court denies the motion to dismiss Count Eight as to all D & O Defendants except Serwinski and Ferber.

### g. *Aiding and Abetting Breach of Bailment*

In Count Twelve, Plaintiffs alleged that each of the D & O Defendants aided and abetted a breach of bailment. The D & O Defendants moved to dismiss, alleging in part that such a cause of action does not exist. (D & O Defs.' Joint Mem. at 70–72.) Plaintiffs' opposition papers did not refute any arguments made in favor of dismissing this claim. Count Twelve is thus waived, *see Lipton*, 315 F.Supp.2d at 446, and the Court grants the motion to dismiss that count.

## B. *CLAIMS AGAINST PwC*

In Counts Thirteen and Fourteen of the CAC, Plaintiffs bring claims against PwC, MFGI's auditor. Count Thirteen alleges professional negligence and is brought on behalf of the Customers and the Trustee. Count Fourteen, which is brought only on behalf of the Trustee, alleges breach of fiduciary duties owed to MFGI. PwC has moved to dismiss both counts.

### 1. *Customers' Professional Negligence Claim*

 Because the Customers had no contractual relationship with PwC, they can recover in negligence only if they can establish a relationship with PwC "so close as to approach that of privity." *Pension Comm.*, 446 F.Supp.2d at 199 (internal quotation marks omitted). The test for near-privity arises from the New York Court of Appeals decision in *Credit Alliance Corp. v. Arthur Andersen & Co.*, 65 N.Y.2d 536, 493 N.Y.S.2d 435, 483 N.E.2d

110 (1985), and its progeny. The near-privity test requires the plaintiff to "establish three elements: 1) the accountant must have been aware that the reports would be used for a particular purpose; 2) in furtherance of which a known party was intended to rely; and 3) some conduct by the accountant 'linking' him or her to that known party." *Sec. Investor Prot. Corp. v. BDO Seidman, LLP*, 222 F.3d 63, 73 (2d Cir.2000) (*citing Credit Alliance*, 493 N.Y.S.2d 435, 483 N.E.2d at 118).

Plaintiffs rely heavily on the structure of the CFTC Regulations to support their claim that the Customers relied on PwC's audit report. According to Plaintiffs, the purpose of PwC's audit was, in part, to ensure that adequate controls were in place to segregate and secure customer funds as required by the CFTC Regulations. Plaintiffs then claim that the Customers relied on the lack of any suggestion that the PwC audit found MFGI's controls to be inadequate. There is much to commend about the logic of Plaintiffs' arguments. They relied on a regulatory structure that in turn relied, in part, on PwC's independent audit, and the regulatory structure failed to protect them.

However, the failure of that regulatory structure does not give rise to a professional negligence claim against PwC. Plaintiffs' argument is exactly of the type the Second Circuit rejected in *BDO Seidman*. In that case, a trustee of a failed brokerage firm, as subrogee of the firm's customers, sued the firm's accountant for, among other claims, professional negligence in the accountant's failure to detect and disclose the firm's inadequate internal controls. *See* 222 F.3d at 68. The Circuit Court affirmed dismissal of those claims for failure to meet the second and third prongs of the *Credit Alliance* test. *Id.* at 74. First, the court ruled that the customers were not "known parties" because "the

mere knowledge that some customers will rely on an accountant's work does not establish negligence liability." *Id.* at 75. Second, the court held that the trustee had failed to allege "linking conduct" between the accountant and the customers because the complaint contained no allegation of any direct contact between the customers and the accountant. *Id.* at 76.

Arguably, this case is distinguishable from *BDO Seidman* with respect to the "known parties" prong, because the Customer Class here consists only of those MFGI customers whose funds were subject to the CFTC's segregation requirements. In that sense, the Class might be "an identifiable, particularized group rather than a faceless or unresolved class of persons" such that *Credit Alliance's* second prong is satisfied. *See id.* at 74 (internal quotation marks omitted). But the Court is persuaded that *BDO Seidman's* analysis of the third prong directly controls the outcome in this case. Like the trustee in *BDO Seidman*, Plaintiffs here have not alleged that they had any direct contact with the accountant, PwC. Indeed, the CAC contains no allegation that any of the Customers even read PwC's audit.

Contrary to Plaintiffs' argument (Pls.' PwC Opp'n at 14), *Anwar II* does not stand for the proposition that linking conduct can be shown without direct conduct. *See* 728 F.Supp.2d at 455–56 (describing how the materials at issue were sent directly to the plaintiffs). Nor does *Kidd v. Havens*, 171 A.D.2d 336, 577 N.Y.S.2d 989 (4th Dep't 1991). There, the document at issue—a report stating that property had clear title—was sent to the plaintiff. *Id.* at 990; *see also id.* at 992 (noting that certification of clear title "is intended for the benefit of, and reliance by, a particular lender or purchaser to *whom it will* be *delivered*" (emphasis added)). Instead, as the Second Circuit squarely held in *BDO*

*Seidman,* the absence of any direct contact between an accountant and the plaintiffs is fatal to a negligence claim. *See* 222 F.3d at 76.

The Court is thus persuaded that Plaintiffs' failure to allege any direct "linking conduct" between the Customers and PwC requires dismissal of the Customers' negligence claim against PwC.

### 2. Trustee's Professional Negligence and Fiduciary Duty Claims

▮▮▮▮ PwC argues that the Trustee's claims are barred by the doctrine of *in pari delicto.* (PwC's Mem. at 12–16.) "The doctrine of in pari delicto mandates that the courts will not intercede to resolve a dispute between two wrongdoers." *Kirschner v. KPMG LLP,* 15 N.Y.3d 446, 912 N.Y.S.2d 508, 938 N.E.2d 941, 950 (2010) (footnote omitted). The doctrine prohibits one party from suing another where the plaintiff was "an active, voluntary participant in the unlawful activity that is the subject of the suit." *Pinter v. Dahl,* 486 U.S. 622, 636, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988); *see also BrandAid Mktg. Corp. v. Biss,* 462 F.3d 216, 218 (2d Cir.2006). In *pari delicto* serves to deter illegality by denying relief to a wrongdoer and to avoid forcing courts to intercede in disputes between two wrongdoers. *See Kirschner,* 912 N.Y.S.2d 508, 938 N.E.2d at 950. While a claim of in *pari delicto* sometimes requires factual development and is therefore not amenable to dismissal at the pleading stage, *see Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.,* 711 F.3d 68, 80 (2d Cir.2013), the doctrine can apply on a motion to dismiss if its application is "plain on the face of the pleadings." *BLMIS,* 721 F.3d at 65 (*citing Kirschner,* 912 N.Y.S.2d 508, 938 N.E.2d at 946 n. 3).

▮▮▮▮ The traditional principle that a corporation is liable for the acts of its agents and employees applies with full force to the *in pari delicto* analysis. *See Kirschner,* 912 N.Y.S.2d 508, 938 N.E.2d at 950–51. Because a bankruptcy trustee stands in the shoes of the bankrupt corporation, in *pari delicto* prevents the trustee from recovering in tort if the corporation, acting through authorized employees in their official capacities, participated in the tort. *BLMIS,* 721 F.3d at 63 (*citing Wight v. BankAmerica Corp.,* 219 F.3d 79, 87 (2d Cir.2000)). The only exception to this rule arises where the agent has "*totally abandoned* his principal's interests and [is] acting entirely for his own or another's purposes." *Kirschner,* 912 N.Y.S.2d 508, 938 N.E.2d at 952 (emphasis in original). That exception is "narrow" and limited to cases "where the insider's misconduct benefits only himself or a third party[.]" *Id.*

The New York Court of Appeals' recent decision in *Kirschner* bears directly on the application of the in *pari delicto* doctrine to claims against an auditor by the corporation that employed it. The Court of Appeals considered a question certified to it by the Delaware Supreme Court:

> "Would the doctrine of in pari delicto bar a derivative claim under New York law where a corporation sues its outside auditor for professional malpractice or negligence based on the auditor's failure to detect fraud committed by the corporation; and, the outside auditor did not knowingly participate in the corporation's fraud, but instead, failed to satisfy professional standards in its audits of the corporation's financial statements?"

*Id.,* 912 N.Y.S.2d 508, 938 N.E.2d at 949–50 (*quoting Teachers' Ret. Sys. of La. v. PriceWaterhouseCoopers, LLP,* 998 A.2d 280, 282–83 (Del.2010)).

In a 4–3 decision, the Court of Appeals ruled that *in pari delicto* does bar such a claim. *See id.,* 912 N.Y.S.2d 508, 938 N.E.2d at 959. The court rejected the

plaintiffs' various arguments in support of auditor liability. Instead, the court ruled, the policy principle underlying in *pari delicto*—preventing "the creditors and shareholders of the company that employs miscreant agents to enjoy the benefit of their misconduct without suffering the harm"—supported the doctrine's application to bar a corporation's negligence claim against an auditor. *Id.*, 912 N.Y.S.2d 508, 938 N.E.2d at 959.

Plaintiffs seek to distinguish *Kirschner* on two grounds. First, they claim that *in pari delicto* does not apply where the corporate agents are not alleged to have committed fraud. (Pls.' PwC Opp'n at 18.) But the United States Supreme Court has explicitly rejected the suggestion that *in pari delicto* "applies only when the plaintiff's fault is intentional or willful." *Pinter*, 486 U.S. at 633, 108 S.Ct. 2063. Rather, *in pari delicto* requires only that the plaintiff was "an active, voluntary participant in the unlawful activity that is the subject of the suit." *Id.* at 636, 108 S.Ct. 2063. Plaintiffs, of course, in other respects rely on the D & O Defendants' active involvement in the unlawful activity to support many of their claims. And the activities of the D & O Defendants acting with authority in their official capacities are imputed to MFGI such that MFGI was an active and voluntary participant in that unlawful activity.

Second, Plaintiffs argue that applying in *pari delicto* would be inequitable because, unlike traditional creditors, the Customers did not take any investment risk with respect to segregated and secured customer funds. (Pls. PwC Opp'n at 19 n. 22.) Thus, Plaintiffs seek to distinguish themselves from the general creditors and shareholders whose suit was barred in *Kirschner*. The Court is not persuaded that this distinction should affect the outcome. In *Kirschner*, the Court of Appeals rejected the argument that the innocence of creditors and shareholders should affect the application of *in pari delicto*. The Court of Appeals noted that an auditor's stakeholders are at least as innocent as the company's creditors and shareholders and sought to avoid "creating a double standard whereby the innocent stakeholders of the corporation's outside professionals are held responsible for the sins of their errant agents while the innocent stakeholders of the corporation itself are not charged with knowledge of their wrongdoing agents." *Kirschner*, 912 N.Y.S.2d 508, 938 N.E.2d at 958. That logic applies here as well: holding PwC liable would hold its shareholders responsible for their agents while holding the Customers not responsible for their agents, even though the Customers are just as innocent as the PwC shareholders.

Moreover, the Court has already determined that the Customers' direct claim against PwC should be dismissed for failure to show near-privity with PwC. The Court is persuaded that to allow Plaintiffs to do an end-run around that holding and assert claims against PwC on behalf of the Trustee solely because of their position as customers would be inconsistent with the prohibitions that New York law places on suits against auditors.

*Kirschner* focuses not on the relative innocence of the company's creditors, but rather on the relative fault of the plaintiff and the defendant. Here, the only reasonable inference that can be drawn from the facts in the CAC is that MFGI "bears at least substantially equal responsibility for the violations [it] seeks to redress[.]" *Pinter*, 486 U.S. at 633, 108 S.Ct. 2063 (*quoting Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 310–11, 105 S.Ct.

2622, 86 L.Ed.2d 215 (1985)).[18]

The Court thus concludes that *Kirschner* directly controls the outcome here. The in *pari delicto* defense is thus available on the face of the pleadings and can apply at this stage of the proceedings. *See BLMIS*, 721 F.3d at 65. PwC's motion to dismiss the Trustee's two counts against it is therefore granted.

## C. *LEAVE TO REPLEAD*

▆ Though a court "should freely give leave" to amend "when justice so requires," Fed.R.Civ.P. 15(a)(2), "it is within the sound discretion of the district court to grant or deny leave to amend. A district court has discretion to deny leave for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir.2007) (citations omitted).

Plaintiffs have already had one opportunity to file a consolidated amended complaint in this action. They also have had access to several reports and investigations by regulatory and legislative bodies that detailed the facts and circumstances giving rise to Plaintiffs' claims. Given that context, repleading the claims that the Court has dismissed would likely be futile. Thus, the Court will grant leave to replead only upon a good faith, compelling request by Plaintiffs containing sufficient new factual allegations plausibly showing that such repleading would correct the deficiencies identified in the Court's findings that warranted dismissal of particular claims. Plaintiffs may submit any such application within twenty-one days of the date of this Decision and Order.

## D. *CONCLUSION*

In sum, in regards to Plaintiffs' claims against the D & O Defendants the Court (1) dismisses the claims for direct violations of the CEA (Count One), breach of fiduciary duty (Counts Three, Five, and Eleven), negligence to the Trustee (Count Seven), and aiding and abetting bailment (Count Twelve) in their entirety; and (2) dismisses the remaining claims against defendants Serwinski and Ferber (Counts Two, Four, Six, and Eight). The Court denies the motion to dismiss with respect to the remaining D & O Defendants–Corzine, Steenkamp, Abelow, O'Brien, Dunne, and Mahajan—as to aiding and abetting violations of the CEA (Count Two), aiding and abetting breach of fiduciary duty (Count Four), negligence to the Customers (Count Six), tortious interference with contract or business advantage (Count Eight), conversion (Count Nine), and aiding and abetting conversion (Count Ten).

The Court also grants the motion to dismiss both of Plaintiffs' claims against PwC (Counts Thirteen and Fourteen).

## V. *ORDER*

For the reasons discussed above, it is hereby

**ORDERED** that the motion (Dkt. No. 422) of defendants Jon S. Corzine ("Corzine"), Henri J. Steenkamp ("Steenkamp"), Bradley I. Abelow ("Abelow"), Laurie R. Ferber ("Ferber"), Edith O'Brien ("O'Brien"), Christine A. Serwinski ("Serwinski"), David Dunne ("Dunne"), and Vinay Mahajan ("Mahajan") is **GRANTED** as to Counts One, Three, Five, Seven, Eleven, and Twelve, **GRANTED** as to defendants Serwinski and Ferber with re-

---

**18.** For that reason, *BrandAid*, 462 F.3d 216, which Plaintiffs call "highly persuasive" (Pls.' PwC Opp'n at 16), is inapposite. There, the court relied on its conclusion that the "plaintiff's wrongdoing was far less culpable than [the] defendants'." *BrandAid*, 462 F.3d at 219. That is not the case here.

spect to Counts Two, Four, Six, and Eight, and **DENIED** as to defendants Corzine, Steenkamp, Abelow, O'Brien, Dunne, and Mahajan with respect to Counts Two, Four, Six, Eight, Nine, and Ten; and it is further

**ORDERED** that the motion (Dkt. No. 426) of defendant PricewaterhouseCoopers LLP is **GRANTED;** and it is finally

**ORDERED** that Plaintiffs herein are granted leave to replead upon submitting to the Court, within twenty-one days of the date of this Decision and Order, in the form of a letter-brief not to exceed three pages, an application plausibly showing that such repleading would correct the deficiencies identified in the Court's findings discussed above, and thus would not be futile.

**SO ORDERED.**

### *APPENDIX*

This appendix lists the parties' filings in this matter.

1. Mem. of Law Supp. Defs.' Corzine, Steenkamp, Abelow, Ferber, O'Brien, Serwinski, Dunne, and Mahajan's Mot. Dismiss, dated January 16, 2013 ("D & O Defs.' Joint Mem."), Dkt. No. 440

2. Supplemental Mem. of Law Supp. Def. Abelow's Mot. Dismiss, dated January 16, 2013 ("Abelow's Mem."), Dkt. No. 423

3. Supplemental Mem. of Law Supp. Def. Ferber's Mot. Dismiss, dated January 16, 2013 ("Ferber's Mem."), Dkt. No. 424

4. Def. Dunne's Supplemental Mem. of Law Supp. Mot. Dismiss, dated January 16, 2013 ("Dunne's Mem."), Dkt. No. 425

5. Def. O'Brien's Supplemental Mem. of Law Supp. Mot. Dismiss, dated January 16, 2013 ("O'Brien's Mem."), Dkt. No. 432

6. Def. Corzine's Supplemental Mem. of Law Supp. Mot. Dismiss, dated January 16, 2013 ("Corzine's Mem."), Dkt. No. 436

7. Supplemental Mem. of Law Supp. Def. Mahajan's Mot. Dismiss, dated January 16, 2013 ("Mahajan's Mem."), Dkt. No. 437

8. Steenkamp's Supplemental Mem. of Law Supp. Mot. Dismiss, dated January 16, 2013 ("Steenkamp's Mem."), Dkt. No. 439

9. Supplemental Mem. of Law Supp. Def. Serwinski's Mot. Dismiss, dated January 16, 2013 ("Serwinski's Mem."), Dkt. No. 441

10. PricewaterhouseCoopers LLP's Mem. of Law Supp. Mot. Dismiss, dated January 16, 2013 ("PwC's Mem."), Dkt. No. 427

11. Customer Pls.' Mem. of Law in Response to D & O Defs.' Joint Mot. Dismiss, dated October 28, 2013 ("Pls.' Joint D & O Opp'n"), Dkt. No. 549

12. Customer Pls.' Omnibus Mem. of Law in Response to D & O Defs.' Individual Supplemental Mem. of Law Supp. Joint Mot. Dismiss, dated October 28, 2013 ("Pls.' Omnibus D & O Opp'n"), Dkt. No. 550

13. Customer Pls.' Mem. of Law in Response to Def. PricewaterhouseCoopers LLP's Mot. Dismiss, dated October 28, 2013 ("Pls.' PwC Opp'n"), Dkt. No. 551

14. Reply Mem. of Law Supp. Defs.' Corzine, Steenkamp, Abelow, Ferber, O'Brien, Serwinski, Dunne, and Mahajan's Mot. Dismiss, dated November 27, 2013 ("D & O Defs.' Joint Reply"), Dkt. No. 582

15. Supplemental Reply Mem. of Law Supp. Def. Serwinski's Mot. Dismiss, dated November 26, 2013 ("Serwinski's Reply"), Dkt. No. 574

16. Def. Dunne's Supplemental Reply Mem. of Law Supp. Mot. Dismiss, dated November 27, 2013 ("Dunne's Reply"), Dkt. No. 577

17. O'Brien's Supplemental Reply Mem. of Law Supp. Mot. Dismiss, dated November 27, 2013 ("O'Brien's Reply"), Dkt. No. 578

18. Supplemental Reply Mem. of Law Supp. Abelow's Mot. Dismiss, dated November 27, 2013 ("Abelow's Reply"), Dkt. No. 579

19. Def. Corzine's Supplemental Reply Mem. of Law Supp. Mot. Dismiss, dated November 27, 2013 ("Corzine's Reply"), Dkt. No. 580

20. Def. Ferber's Supplemental Reply Mem. of Law Supp. Mot. Dismiss, dated November 27, 2013 ("Ferber's Reply"), Dkt. No. 581

21. Supplemental Reply Mem. of Law Supp. Def. Mahajan's Mot. Dismiss, dated November 27, 2013 ("Mahajan's Reply"), Dkt. No. 583

22. Steenkamp's Supplemental Reply Mem. of Law Supp. Mot. Dismiss, dated November 27, 2013 ("Steenkamp's Reply"), Dkt. No. 584

23. PricewaterhouseCoopers LLP's Reply Mem. of Law Supp. Mot. Dismiss, dated November 27, 2013 ("PwC's Reply"), Dkt. No. 576